No. 23-2317

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

RODNEY D. PIERCE and MOSES MATTHEWS,

*Plaintiffs-Appellants,*

v.

THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, JEFF CARMON III, in his official capacity as Secretary of the North Carolina State Board of Elections, STACY "FOUR" EGGERS IV, in his official capacity as a member of the North Carolina State Board of Elections, KEVIN N. LEWIS, in his official capacity as a member of the North Carolina State Board of Elections, SIOBHAN O'DUFFY MILLEN, in her official capacity as a member of the North Carolina State Board of Elections, PHILIP E. BERGER, in his official capacity as President Pro Tem of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

*Defendants-Appellees.*

---

On Appeal From the United States District Court for
the Eastern District of North Carolina
The Honorable James E. Dever III (No. 4:23-cv-193-D-RN)

---

## OPPOSITION OF LEGISLATIVE DEFENDANTS-APPELLEES TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Phillip J. Strach
Thomas A. Farr
Alyssa M. Riggins
Cassie A. Holt
Alexandra M. Bradley
301 Hillsborough Street
Suite 1400
Raleigh, North Carolina 27603
(919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
alex.bradley@nelsonmullins.com

Richard B. Raile
Katherine L. McKnight
Trevor M. Stanley
Benjamin D. Janacek
1050 Connecticut Ave. NW,
    Suite 1100
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com
kmcnight@bakerlaw.com
tstanley@bakerlaw.com
bjanacek@bakerlaw.com

Patrick T. Lewis
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

TABLE OF CONTENTS

STATEMENT.................................................................................... 1

ARGUMENT .................................................................................... 3

    I.    The Court Lacks Jurisdiction ............................................. 3

    II.    Plaintiffs Are Not Entitled to an Injunction ................................. 3

        A.    Plaintiffs Will Not Succeed on the Merits of This Appeal........ 4

            1.    The First Precondition................................................. 5

                a.    Compactness ...................................................... 5

                b.    Numerosity...................................................... 10

            2.    The Third Precondition ............................................. 11

                a.    Majority-Minority Districts Are Unnecessary ..... 12

                b.    Polarization Is Political, Not Racial ................... 15

            3.    Totality of the Circumstances .................................... 16

        B.    The Equities Militate Against an Injunction ......................... 18

CONCLUSION.................................................................................. 21

## STATEMENT

Plaintiffs are two Black voters who presented a preliminary-injunction motion to the district court seeking a new majority-minority State Senate district in northeast North Carolina that—in their own telling—"would break county groupings otherwise required by North Carolina's Whole County Provisions." D.Ct.Doc.42 at 4 (quotation marks omitted). This disturbance of the county-grouping formula would require revisions of districts across the Senate plan in ways that are unknown and unpredictable.

After the district court declined Plaintiffs' demand to turn this proceeding into "a game of ambush" by resolving it over Thanksgiving weekend, D.Ct.Doc.23 at 3 (quoting *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023)), and after it scheduled a hearing for January 10, 2024, on the grounds that Plaintiffs' entitlement to relief "is not as clear as plaintiffs suggest" and that it needs "to hear from the advocates and to have advocates answer the court's questions," D.Ct.Doc.43 at 3, 5, Plaintiffs declared defeat and refiled their preliminary-injunction motion with this Court, without even awaiting a ruling.

The Court should have no trouble rejecting that maneuver. No appealable order supports this appeal, and there is no right to an appellate forum just because a district court is somewhat skeptical of a position, because litigants would rather not have to answer its questions, or because proceedings are slightly more drawn out than a plaintiff would like. That is the sum of Plaintiffs' complaint. The schedule they would have this Court follow, resulting in a January 9 ruling in time for a January 19 deadline, is not materially different

from the district court's schedule, entailing a January 10 hearing in time for a ruling before the same supposed deadline.[1] The district court moved this matter along more quickly than the most recent §2 case to be resolved in the Supreme Court moved. *Allen v. Milligan*, 599 U.S. 1, 16 (2023) (describing hearing ending January 12, 2022, in litigation commenced November 4, 2021). Plaintiffs have no colorable claim to "constructive" jurisdiction when the only thing frustrating the district court's ability to issue a ruling on the timeline they demand is *this appeal*.

This Court is the wrong forum for the additional reason that Plaintiffs brought a Voting Rights Act §2 claim, and "the ultimate finding of vote dilution" under §2 is "a question of fact." *Thornburg v. Gingles*, 478 U.S. 30, 78 (1986). This Court's "function is not authoritatively to find the 'facts' in the first instance," but to review the district court's findings for clear error. *Moore v. City of Charlotte, N.C.*, 754 F.2d 1100, 1104 (4th Cir. 1985); *see Gingles*, 478 U.S. at 78-79. The Court cannot review findings yet to be issued and is not postured to examine the "835 pages of filings" where Legislative Defendants-Appellees (Legislative Defendants) "hotly dispute" Plaintiffs' assertions. D.Ct.Doc.43 at 4, 6.

---

[1] Hours before this filing was due, Plaintiffs withdrew their motion for an injunction, announcing that January 19 is no longer the deadline they deem necessary to hit, C.A.4.Doc.30-1, but they do not say how they retain a good-faith argument for appellate jurisdiction. Legislative Defendants present this opposition out of an abundance of caution.

Even if jurisdiction were proper, Plaintiffs' demand is untenable. They cannot justify a new majority-minority district that is neither reasonably configured nor necessary in a region with high white crossover voting. And the *Purcell* principle forbade relief the moment Plaintiffs filed their preliminary-injunction motion—28 days after the challenged plan was enacted. This Court's intervention would be improper and threaten an election meltdown. Procedural strictures exist to prevent such outcomes, and there is no basis to jettison them here.

## ARGUMENT

### I. The Court Lacks Jurisdiction

The Court may only "grant[] an injunction while an appeal is pending," Fed. R. App. P. 8(a)(1)(C), and this one will not be pending long. As explained in Legislative Defendants' opposition to Plaintiffs' motion to expedite, this Court lacks jurisdiction, as no appealable order has issued, nor is there a refusal to rule. That should end the matter.

### II. Plaintiffs Are Not Entitled to an Injunction

An injunction pending appeal "demands a significantly higher justification than a request for a stay, because unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (quotation marks omitted). Plaintiffs' invocation of "the 'traditional' standard for a stay," *Nken v. Holder*, 556 U.S. 418, 425 (2009), is mistaken, Mot. 11. Plaintiffs must show that "'the legal rights at

issue are indisputably clear,' and, even then," an injunction may be issued "'sparingly and only in the most critical and exigent circumstances.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring) (citation omitted). Moreover, Plaintiffs demand "[m]andatory preliminary injunctive relief"—which "goes well beyond simply maintaining the status quo *pendente lite*"—that "in any circumstance is disfavored." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citation omitted). These high standards preclude Plaintiffs' unprecedented demands.

### A.    Plaintiffs Will Not Succeed on the Merits of This Appeal

Plaintiffs fail to establish an indisputable right to relief for the threshold reason that the Eighth Circuit recently held there is no private right of action to enforce §2. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1206-07 (8th Cir. 2023). That decision represents the most thorough analysis of the question of any court to address it. *Contrast Robinson v. Ardoin*, 86 F.4th 574, 587-91 (5th Cir. 2023) (virtually no textual analysis). Uncertainty plagues Plaintiffs' novel motion from the get-go.

That aside, Plaintiffs are unlikely to succeed in this defective appeal. Plaintiffs alleging vote dilution under §2 must prove "three threshold conditions": that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; that the group is "politically cohesive"; and that a white majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 581 U.S. 285, 301–02 (2017) (citation omitted). "If a plaintiff

makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018). As noted, "the ultimate finding of vote dilution" under §2 is "a question of fact." *Gingles*, 478 U.S. at 78. By consequence, all Plaintiffs' arguments, *see* Mot. 12-21, are fact-based arguments, as their 420+ pages of expert reports and other exhibits confirm, *see* CA4.Doc. 4-2, at 1-424. That, too, should end the matter.

In any event, Plaintiffs' positions lack merit.

### 1.    The First Precondition

Plaintiffs' illustrative plans do not establish the first precondition, which is "focused on geographical compactness and numerosity." *Allen*, 599 U.S. at 18.

### a.    Compactness

Supreme Court precedent addressing "compactness" explains that "no precise rule has emerged" to define it. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). Districts must be "reasonably configured" to satisfy the first precondition, *Cooper*, 581 U.S. at 301; *accord Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022), which means they "should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries," *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quotation marks omitted); *accord LULAC*, 548 U.S. at 432-33. This Court is in no position to decide what a reasonably configured North Carolina

district is in the first instance. Regardless, Plaintiffs' plans (Demonstration A and B) fail for several reasons.

*First*, both plans depart from North Carolina's Whole County Provisions (WCP), which dictate that "[no] county shall be divided in the formation of a Senate district." N.C. Const. art. II, §3; *see id.* art. II, §5 (same for House districts). Although the federal one-person, one-vote rule and (in some instances) the VRA foreclose strict compliance with the WCP, the North Carolina Supreme Court interpreted the WCP to forbid county lines from being transgressed "for reasons unrelated to compliance with federal law." *Stephenson v. Bartlett*, 562 S.E.2d 377, 389 (N.C. 2002) (*Stephenson I*). The court therefore directed that "legislative districts required by the VRA" be "formed prior to creation of non-VRA districts," that total-population deviations "be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements," and that county groupings be identified consistent with those federal rules. *See id.* at 396-97. The WCP formula of county groupings and traversal rules is objectively ascertainable. *Id.*; *see also Stephenson v. Bartlett*, 582 S.E.2d 247, 248 (N.C. 2003) (*Stephenson II*); *Dickson v. Rucho*, 766 S.E.2d 238, 258 (N.C. 2014), *vacated on other grounds*, 575 U.S. 959 (2015).

Both Demonstration A and B depart from the WCP formula. *See* D.Ct.Doc.39-6 at 6-7. Demonstration District A contravenes the WCP by breaking the single-district county groupings of SD1, SD2, and SD11 by combining three counties from SD1 (Northampton, Hertford, Bertie), four counties from SD2 (Warren, Halifax, Martin, Washington), and one from SD11

(Vance). Demonstration District A would inflict such havoc that numerous Senate districts across the State would likely need to be redrawn. Demonstration Districts B-1 and B-2 also break county groupings and illegally divide Pasquotank County to form a crossover district, *see infra* §II.A.1.b.

Plaintiffs asserted below that county boundaries are optional because *Stephenson I* and its progeny authorize departures from county lines for "legislative districts required by the VRA." *Stephenson I*, 562 S.E.2d at 396-97. That is circular. Districts that violate a state's neutral criteria are not reasonably configured, and §2 does not require them. *Allen*, 599 U.S. at 20. This inquiry looks to "traditional districting criteria," including maintaining "county lines." *Id.* The North Carolina Supreme Court's recognition that federal law overrides state law did not alter the scope of federal law, authorize federal courts to override county boundaries more than necessary to implement federal dictates, or declare that districts dismantling county groupings are reasonably configured. Rather, *Stephenson I* referenced federal dictates that do not have a reasonable-configuration requirement, including the one-person, one-vote principle and the non-retrogression command of VRA §5. *See Stephenson I*, 562 S.E.2d at 396-97.

*Second*, Plaintiffs have not proven that Demonstration A or B can be part of a reasonably configured Senate plan governing North Carolina. Successful §2 claimants have presented entire plans, not isolated districts. *See Allen*, 599 U.S. at 19-21; *LULAC*, 548 U.S. at 435. That is necessary because there would be no value in a showing that a majority-minority district is reasonably configured if it

7

will turn neighboring districts, or the plan, into "a monstrosity." *Allen*, 599 U.S. at 28 (quoting *Miller v. Johnson,*, 515 U.S. 900, 909 (1995)).

Plaintiffs' failure to present entire plans is not a technicality. Demonstration A and B destroy county groupings. Assuming the VRA requires certain districts, State precedent requires that the General Assembly configure them "prior to…non-VRA districts," *Stephenson I*, 562 S.E.2d at 396-97, because the formula governing the entire State builds upon the VRA districts. *See Dickson*, 766 S.E.2d at 258. By breaking up the county groupings in northeastern North Carolina, Plaintiffs' Demonstration District A would reset the county-grouping formula for the *entire State*. An order adopting Demonstration A would send shockwaves likely mandating a significant re-draw. Because Plaintiffs have not proven that this redraw will result in reasonably configured districts elsewhere, they fail the first precondition.

*Third*, there is particular cause for concern of the impact of new county groupings on neighboring districts, given that enacted SD1 and SD2 border SD5, which has a Black voting-age population (BVAP) of 40.35%, CA4.Doc.4-2 at 10, and likely qualifies as a "crossover" district, i.e., a district "in which minority voters make up less than a majority of the voting-age population" but where "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). SD5 is a current minority opportunity district. Neighboring SD11, at 36.65% BVAP, may also qualify as a crossover district.    CA4.Doc.4-2 at 10. Although §2 does not mandate

8

crossover districts, states may create them "as a matter of legislative choice or discretion," *id.* at 23, and §2 can "be *satisfied by* crossover districts," *Cooper*, 581 U.S. at 305. Demonstration District A dismantles SD11, and reconfiguring the county groupings, and all district lines, around SD1 and SD5 may dismantle districts like SD5 that currently provide equal minority opportunity.[2]

But "a § 2 violation is proved for a particular area," *Shaw v. Hunt*, 517 U.S. 899, 917 (1996), so dismantling one district for some minority voters (in SD5) to create another district for other minority voters (Demonstration A or B) is improper, *see id.* at 917 (rejecting the notion that a majority-Black district may be drawn "anywhere" as "a misconception of the vote-dilution claim"); *Johnson v. DeGrandy*, 512 U.S. 997, 1019 (1994) (rejecting the notion that "the rights of some minority voters under §2 may be traded off against the rights of other members of the same minority class"). Without establishing the impact of Demonstration A or B on minority opportunity elsewhere, Plaintiffs show "that lines could have been drawn elsewhere, nothing more." *DeGrandy*, 512 U.S. at 1015.

*Fourth*, Demonstration A and B are racial gerrymanders. VRA §2 does not require majority-minority districts drawn with "a 'quintessentially race-conscious calculus,'" *Allen,* U.S. at 31 (plurality opinion) (citation omitted), which occurs where the map-maker "subordinate[s] traditional race-neutral

---

[2] One of Plaintiffs' experts announced that the demonstration districts do not dismantle SD5, CA4.Doc.4-2 at 12-13, but no evidence supports that "*ipse dixit*" assertion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

districting principles…to racial considerations," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (citation omitted); *see also Robinson*, 86 F.4th at 594–95 & n.4 (reading *Allen* to hold that §2 is not satisfied by district where race predominates). For North Carolina legislative plans, application of that test has proven straightforward because departures from the WCP formula to hit racial targets presents a clean case of predominance. *See Covington v. North Carolina*, 316 F.R.D. 117, 131-32, 138-39 (M.D.N.C. 2016). Plaintiffs' expert deemed hitting racial targets of predominant importance over North Carolina redistricting principles, opting to destroy (state) constitutionally-mandated districts to achieve a singular goal. CA4.Doc.4-2 at 16. "While the line between racial predominance and racial consciousness can be difficult to discern," *Allen,* 599 U.S. at 31, it is not here.

### b.    Numerosity

Demonstration District B-1 does not satisfy the numerosity requirement, which is unmet if "the minority group makes up less than 50 percent of the voting-age population in the potential election district." *Bartlett*, 556 U.S. at 12 (plurality opinion). Plaintiffs admit the BVAP of Demonstration District B-1 is 48.41%, which is below 50%. Mot. 13. As in *Bartlett*, which found §2 does not require the State to sacrifice the WCP formula for a district below 50% BVAP, 556 U.S. at 7, Plaintiffs admit that Demonstration Districts B-1 and B-2 contravene the WCP, and it cannot show §2 liability.

Plaintiffs observe that the Black citizen voting-age population (CVAP) of Demonstration District B-1 is 50.19%. Mot. 13. "However, CVAP has been

applied only where there is a significant noncitizen population." *Pope v. Cnty. of Albany*, 2014 WL 316703, at *12 (N.D.N.Y. Jan. 28, 2014). Otherwise, the first precondition looks to "the *voting-age* population in the potential election district." *Bartlett*, 556 U.S. at 12 (emphasis added). The purpose of utilizing CVAP is for "refinement" of VAP figures to account for "a significant difference in the citizenship rates of the majority and minority populations," as often occurs in cases involving Hispanic populations. *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1568 (11th Cir. 1997). CVAP is "less reliable" than VAP, *Pope*, 2014 WL 316703, at *13, which is reported in the decennial census, an enumeration of the population in each U.S. jurisdiction. *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 342-43 (1999). By contrast, CVAP estimates are drawn from the American Community Survey (ACS) as "a rolling statistical estimate with accompanying margins of error." Brief for the United States as Amicus Curiae, *Evenwel v. Abbott*, No. 14-940, 2015 WL 5675829, at *22 (filed Sep. 2015) (U.S. *Evenwel* Br.). The ACS "is less reliable than Census data and not intended to be used in redistricting." *Pope*, 2014 WL 316703, at *13 n.22 (citation omitted); U.S. *Evenwel* Br. at *22 ("The U.S. Census Bureau explicitly cautions against using American Community Survey data as the basis for redistricting[.]").

### 2.    The Third Precondition

Plaintiffs are also unlikely to establish the third precondition, which requires proof of an "amount of white bloc voting that can generally 'minimize

11

or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted).

### a. Majority-Minority Districts Are Unnecessary

The evidence before the trial court shows that a majority-Black district is unnecessary to ensure equal minority opportunity in the relevant regions, and white bloc voting lacks legal significance. While "the general term 'racially polarized voting'…simply refers to when different racial groups 'vote in blocs for different candidates,'" the "third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting.'" *Covington*, 316 F.R.D. at 170 (citations omitted). "[A] general finding regarding the existence of any racially polarized voting, no matter the level, is not enough" to satisfy the third precognition. *Id.* "The key inquiry…is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 168 (emphasis added) (quotation and edit marks omitted). Because a remedial district is a majority-BVAP district, *Bartlett*, 556 U.S. at 19, there is no legally significant racially polarized voting if minority-preferred candidates have an equal opportunity to win districts at below 50% BVAP. *Id.* at 18; *Covington*, 316 F.R.D at 168-69; *see also Bartlett*, 556 U.S. at 16, 24.

The Supreme Court's summary affirmance in *Covington* confirmed this principle. The *Covington* court took issue with the General Assembly's decision to create majority-Black legislative districts based on the advice of experts who found "statistically significant racially polarized voting in 50 of the 51 counties

12

studied." *Covington*, 316 F.R.D. at 169 (quotation marks omitted). The three-judge district court criticized these experts for addressing "'racially polarized voting'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Covington*, 316 F.R.D. at 170. But they missed, the court wrote, the "crucial difference between <u>legally significant</u> and <u>statistically significant</u> racially polarized voting." *Id.* (underlining in original). Whereas polarized voting can occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," *id.* at 170, "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,'" *id.* (citation omitted). Non-actionable polarized voting becomes legally significant only when "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, if no remedial district were drawn." *Id.* at 168 (quotation and edit marks omitted). The question is whether "the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." *Id.* (emphasis added). Because the third precondition was not shown, the court struck down the plan as a racial gerrymander, and the Supreme Court affirmed.

Plaintiffs' claim fails on this same basis. Their expert—like the experts in *Covington*—found "statistically significant racially polarized voting," CA4 Doc. 4-2 at 272; *see also id.* at 273, but not legally significant polarized voting. Plaintiffs' expert did not determine whether "a VRA remedy" in the form of a majority-BVAP district is necessary for equal minority opportunity. *Id.* at 168.

As *Covington* explained, the way to determine whether majority-BVAP districts are necessary is a "district effectiveness analysis," which "determine the minority voting-age population level at which a district 'becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." *Id.* at 169 & n.46 (quotation and alteration marks omitted). But Plaintiffs' expert did not perform a district effectiveness analysis.

Moreover, evidence before the district court confirms that legally significant polarized voting does not exist in the relevant areas. *See* D.Ct.Doc.39-7 at 2; D.Ct.Doc. 39-8 at 10-23. That is no surprise. *Covington* involved some of the counties at issue here, including Vance, Warren, and Halifax, where the third precondition was not satisfied. *See* 316 F.R.D. at 151-52, 158-59. Moreover, the Supreme Court in *Cooper* found no legally significant racially polarized voting in last decade's rendition of CD1, 581 U.S. at 301-06, and that district occupied the same counties at issue here, *see id.* at 325. There is no reason to believe the third precondition can be satisfied here when it was not in *Cooper* or *Covington*. Plaintiffs' counsel know this: they filed a brief and sponsored expert evidence in recent state-court litigation advocating the above-described view of the third precondition and demonstrating that polarized voting lacks legal significance in the relevant areas. *See* D.Ct.Doc.39-1 at 6, 7-32; D.Ct. Doc.39-3 at 1-2. This Court is in no position to find otherwise, when it is the district court's responsibility to review 800+ pages of evidence and make findings of fact and conclusions of law.

14

### b.    Polarization Is Political, Not Racial

North Carolina voting patterns lack legal significance for the additional reason that they reflect a partisan, not a racial, divide. The VRA "is a balm for racial minorities, not political ones—even though the two often coincide." *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (citation omitted).

If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Id.* at 854 (quotation omitted). VRA §2 "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* As the Fifth Circuit explained in *LULAC, Council No. 4434*, a majority of Justices in *Gingles* held §2 liability does not lie where different candidate preferences reflect "interest-group politics." *See id.* at 855-59.

Here, Plaintiffs' expert did not analyze whether voting patterns are polarized for partisan or racial reasons, and an expert study introduced below shows that voting is divided along partisan lines and that "the race of the candidates does not appear to have a polarizing impact on vote choice." D.Ct.Doc.39-7 at 10. Based on this evidence, the district court can conclude that

polarization lacks legal significance, and this Court is not postured to usurp its fact-finding role.

### 3.    Totality of the Circumstances

Plaintiffs are unlikely to make the "ultimate" showing of vote dilution under "the totality of the circumstances." *Gingles*, 478 U.S. at 78. "The ultimate determination of vote dilution under the Voting Rights Act…must be made on the basis of the 'totality of the circumstances.'" *Lewis v. Alamance Cnty.*, 99 F.3d 600, 604 (4th Cir. 1996) (quotation marks omitted). Plaintiffs spit out an array of factors they believe support their position, *see* Mot. 17-19, but that exercise itself confirms they do so in the wrong forum. Besides, the relevant factors, *see Gingles*, 478 U.S. at 36-37, cut against Plaintiffs.

*First*, "the policy underlying the state['s] use of" the challenged districts is not "tenuous," but compelling. *Id.* at 37 (citation omitted). North Carolina's WCP principles represent a sovereign policy recognized at least as of 1776 that is implemented through objective, neutral, and non-arbitrary means.[3]

*Second*, the "extent to which voting in the elections of the state…is racially polarized" is limited at most. *Gingles*, 478 U.S. at 37. The trial-court evidence shows "substantial crossover voting." *Bartlett*, 556 U.S. at 24.

---

[3] The General Assembly could not have legally enacted Plaintiffs' proposed Demonstration Districts because they do not satisfy the first or third preconditions. Had the General Assembly done so, it would have violated the WCP and drawn an illegal racial gerrymander. *See Bartlett*, 556 U.S. at 13 (plurality opinion).

*Third*, there are no "other voting practices or procedures that may enhance the opportunity for discrimination against the minority group," such as "unusually large election districts, majority vote requirements, [or] anti-single shot provisions." *Gingles*, 478 U.S. at 37 (citation omitted). Plaintiffs point (at 17-18) to past practices they believe were discriminatory, but the question is whether the challenged scheme interacts with other mechanisms in the present to enhance the discriminatory impact of the challenged system.

*Fourth*, Black representatives have been elected to the North Carolina General Assembly in large numbers, *Gingles*, 478 U.S. at 37, as Plaintiffs' evidence confirms, CA4.Doc.4-2 at 395. Plaintiffs claim Black voters are "underrepresented." Mot. 19. But the question is whether "no members," or just a "few," "of a minority group have been elected to office over an extended period of time." S. Rep. 97-417 at 29, n.115 (1982). "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen*, 599 U.S. at 28.

*Fifth*, Plaintiffs present no evidence of "a significant lack of responsiveness" in the General Assembly to minority needs. *Gingles*, 478 U.S. at 37 (citation omitted). Their discussion of this issue (at 19) misapprehends the relevant test. *See N.A.A.C.P., Inc. v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1023 & n.24 (2d Cir. 1995).

*Sixth*, the Supreme Court has explained, one "may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson*, 512 U.S. at 1017.

Accordingly, vote dilution will ordinarily not be found where minority voters "would enjoy substantial proportionality" of equal-opportunity districts. *Id.* at 1014. The North Carolina Supreme Court recently found this to be satisfied without a majority-Black district in the region at issue. *Harper v. Hall*, 881 S.E.2d 156, 180 (2023). Plaintiffs do not address this element.

## B.    The Equities Militate Against an Injunction

Plaintiffs are not entitled to a preliminary injunction because the equities do not support one. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 25-26 (2008). The equities analysis in an election case is governed by the *Purcell* principle, "which establish[es] (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)); *see Wise v. Circosta*, 978 F.3d 93, 98-99 (4th Cir. 2020).

The *Purcell* principle applies here because the "State's election machinery is already in progress." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). The candidate filing period has both begun and ended (running from December 4 to December 15). Ballots will be sent to voters in North Carolina's no-excuse absentee system beginning January 19, 2024. North Carolina State Board of Elections, *Upcoming Election, Overview of 2024 Elections*.[4] In-person early voting runs from February 15

---

[4] https://www.ncsbe.gov/voting/upcoming-election

to March 2, with the primary on March 5. *Id.* In *Allen*, the Supreme Court intervened to stay a three-judge panel's redistricting injunction, which was issued "seven weeks" before delivery of ballots for absentee voting in "the primary elections." 142 S. Ct. at 879 (Kavanaugh, J., concurring). According to the two Justices whose votes were decisive, the *Purcell* principle alone compelled that result. *Id.* at 879-82. Plaintiffs' requested injunction date (January 9) would be ten days before the beginning of absentee voting, making it a far more compelling *Purcell* case than *Allen*. The stay was issued on February 7, 2022—approximately a week after Alabama's candidate filing deadline of January 28, 2022. *See Allen*, 142 S. Ct. at 879; *id.* at 880 (Kavanaugh, J., concurring); Alabama Code §17-13-5. Here, like in *Allen*, the candidate filing deadline has come and gone.

A stay was required in *Allen*, even though the Supreme Court later affirmed on the merits, concluding that the court "faithfully applied our precedents." *Allen*, 599 U.S. at 23. Around the same time, the Fifth Circuit declined to stay a June district-court injunction in Louisiana, notwithstanding that ballots were set to be mailed in September, calling *Allen* "an outlier." *Robinson v. Ardoin*, 37 F.4th 208, 228-29 (5th Cir. 2022). That was erroneous. The Supreme Court entered the stay the Fifth Circuit refused to enter. *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022).

Plaintiffs' arguments to coax this Court down that tried and untrue path fail. They recognize that an injunction would come too late to avoid election intrusion and invite this Court to *effectuate* that intrusion by moving election

19

dates. *See* Mot. 22. That is a concession that *Purcell* applies, and Plaintiffs are wrong to contend that the merits are "entirely clearcut," *id.* at 23, for reasons explained. Plaintiffs analogize this case to litigation in 2022 in North Carolina state court, Mem. 22, but this Court has rejected that analogy, holding that "*Purcell* is about *federal court* intervention" and does not cover "action by state courts." *Wise*, 978 F.3d at 99.[5]

Plaintiffs also say an injunction would impact just "two districts." Mot. 23. But that is not true. As shown, it would throw ballot mailing into disarray, and Plaintiffs admitted below that their proposal "would break county groupings otherwise required by North Carolina's Whole County Provisions," D.Ct.Doc.42 at 4 (quotation marks omitted), and requires substantial revision of Senate district lines statewide, *see* D.Ct.Doc.39-6 at 6-7. Moreover, the Court must afford the General Assembly the first opportunity to cure any violation, *Reynolds*, 377 U.S. at 585-86. If the injunction stayed in *Allen* was "a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters," *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring), the injunction demanded here is a prescription for a meltdown.

Plaintiffs waited 28 days to file their preliminary-injunction motion and created their own *Purcell* problem, as the district court has recognized. *See*

---

[5] Furthermore, the 2022 North Carolina Supreme Court's actions blithely ignored binding precedent. In *Pender County,* the court entered a final judgment declaring a crossover district drawn by the General Assembly illegal for violating the WCP in August of 2007 but stayed the remedy until after the 2008 election cycle to avoid disruption. 649 S.E.2d at 376.

D.Ct.Doc.43 at 2. Plaintiffs demanding equitable relief "must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). Where Plaintiffs demand exceptional and unprecedented relief, including an overhaul of a redistricting plan by an appeals court after cutting out a district court entirely—and on a highly expedited basis—a delay of even a few weeks, as here, is beyond justification.

## CONCLUSION

The motion should be denied and this appeal dismissed.

/s/    Richard B. Raile

Phillip J. Strach
Thomas A. Farr
Alyssa M. Riggins
Cassie A. Holt
Alexandra M. Bradley
301 Hillsborough Street
Suite 1400
Raleigh, North Carolina 27603
(919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
alex.bradley@nelsonmullins.com

Richard B. Raile
Katherine L. McKnight
Trevor M. Stanley
Benjamin D. Janacek
1050 Connecticut Ave. NW,
   Suite 1100
Washington, DC 20036
(202) 861-1711
rraile@bakerlaw.com
kmcnight@bakerlaw.com
tstanley@bakerlaw.com
bjanacek@bakerlaw.com


Patrick T. Lewis
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Ph: (216) 621-0200
plewis@bakerlaw.com

*Counsel for Legislative Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the type-volume limitations of Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(g)(1) because it contains 5,186 words.

2.      This motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Calisto MT font.

Dated: January 3, 2024                    /s/    Richard B. Raile
                                          Richard B. Raile
                                          1050 Connecticut Ave. NW,
                                              Suite 1100
                                          Washington, DC 20036
                                          (202) 861-1711


                                          *Counsel for Legislative Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2024, I electronically filed the foregoing response with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 3, 2024        /s/   Richard B. Raile

Richard B. Raile
1050 Connecticut Ave. NW,
   Suite 1100
Washington, DC 20036
(202) 861-1711

*Counsel for Legislative Defendants-Appellees*